**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:                                          Case No.  13-31119-BKC-JKO

SRAI, INC.,                                     Chapter 7

           Debtor.

**OBJECTION TO TRUSTEE'S MOTION TO APPROVE STIPULATION**
**AND COMPROMISE CONTROVERSY AND MUTUAL GENERAL RELEASE**
**BY AND BETWEEN TRUSTEE AND (A) JADE HOLDINGS GROUP, LLC,**
**(B) SURGERY CENTER OF BROWARD, LLC, (C) STRAX LONGEVITY**
**INSTITUTE A/K/A STRAX WELLNESS, (D) COSMETIC SURGERY ASSOCIATES**
**OF BOCA D/B/A BOCA NEW LOOK, (E) BOCA RATAON SURGERY, (F) STRAX**
**REJUVENATION OF BOCA RATON, AND (G) JEFF DAVIS**

Creditor Christine Williams, by and through undersigned counsel, objects (the "Objection") to the "*Trustee's Motion to Approve Stipulation and Compromise Controversy and Mutual General Release by and Between Trustee and (A) Jade Holdings Group, LLC, (B) Surgery Center Of Broward, LLC, (C) Strax Longevity Institute A/K/A Strax Wellness, (D) Cosmetic Surgery Associates of Boca D/B/A Boca New Look, (E) Boca Raton Surgery, (F) Strax Rejuvenation of Boca Raton, and (G) Jeff Davis*" (the "Motion") [ECF 102].  In support of the Objection, Ms. Williams states as follows:

**Introduction**

1.      This is a corporate chapter 7 case, where substantially all of the assets and business operations of debtor SRAI, Inc. (the "Debtor") were fraudulently transferred to Jade Holdings Group, LLC and other related entities (collectively, "Jade") by the Debtor's principal Jeff Davis ("Davis"), who is also the principal of Jade.

1

2.      The Trustee is proposing to settle claims, including but not limited to the fraudulent transfer (collectively, the "Jade Claims"), for $750,000.00 payable over five (5) years, which amount can be reduced to $700,000.00 if paid sooner (the "Proposed Settlement").

3.      While Ms. Williams acknowledges and appreciates the efforts of the Trustee and his professionals required to secure the Proposed Settlement, Ms. Williams does not believe that it meets the standards for approval contemplated by Rule 9019, Fed. R. Bank. P., and the cases interpreting the rule.

4.      Accordingly, Ms. Williams respectfully requests that the Proposed Settlement be denied at this time because it does not appear to provide for a meaningful distribution to Ms. Williams and the other similarly situated creditors.

### Factual and Procedural Background

#### *The Debtor*

5.      The Debtor operated a cosmetic surgery center doing business under the name Strax Rejuvenation.[1]

6.      Several lawsuits were filed and judgments entered against the Debtor by former patients (or their estates) for medical malpractice, wrongful death, or some other form of personal injury.

#### *Ms. Williams*

7.      Ms. Williams was one such former patient injured by the Debtor.

8.      Ms. Williams is an instructor of deaf children whose dominant arm was injured during a procedure performed by the Debtor due to a missed measurement of where to make an

---

[1] There appear to have been multiple entities owned and operated by, or in conjunction with, the Debtor all under the umbrella of "Strax Rejuvenation," many of which are parties to the Proposed Settlement including but not limited to Jade. At some point in 2013, all operations were transferred out of Debtor into these other entities, and primarily to Jade.

2

incision. The error compromised blood supply which permanently damaged a nerve in her arm.

Ms. Williams now experiences severe problems using that arm.[2]

*Ms. Williams' Judgment and Events Leading to Bankruptcy*

9.  In January 2013, Ms. Williams obtained a judgment against the Debtor for 471,528.47.

10.  In July 2013, Ms. Williams conducted discovery in-aid-of-execution including a deposition of Davis, during which he testified about the numerous lawsuits and settlements related to alleged malpractice, as well as the Debtor's efforts to transfer the Debtor's business to Jade and others.

11.  During the deposition, Davis also agreed to provide a variety of financial records concerning the Debtor, Jade, and other related entities.

12.  After completing the deposition, Ms. Williams began taking steps to execute on her judgment and to further investigate Jade in particular.

13.  In September 2013, Ms. Williams obtained an order authorizing her financial expert, a CPA, to examine Jade's records.

14.  That same day, the Debtor filed the instant bankruptcy case.

**The Settlement Should be Denied**

15.  Ms. Williams appreciates the efforts of the Trustee and his professionals to negotiate a settlement of the Jade Claims. Indeed, the terms and conditions are comprehensive.

16.  Unfortunately, Ms. Williams does not believe the amount of the Proposed Settlement is sufficient to justify approval under Rule 9019, Fed. R. Bank. P.

17.  There are several bases underlying the Objection and they are detailed below.

---

[2]  The Debtor marketed, and recommended to Ms. Williams, the advantage of conducting multiple procedures at one time to save costs. This is not an optimal methodology from a patient health perspective and is believed to be one, but certainly not the only, factor giving rise to Ms. Williams' injuries and those of others.

*Davis Admitted that the Debtor*
*Transferred its Assets and Business*

18.     One of the representations in the Motion is that the cost of filing and litigating the Jade Claims could outpace any potential recovery.

19.     Ms. Williams recognizes that the professional fees resulting from a settlement will be less than those resulting from complex litigation, but believes that liability for the fraudulent transfer has been admitted.

20.     Specifically, Davis admitted under oath that the Debtor transferred its assets and business operations to Jade (and possibly other entities).

21.     In the July 2013 deposition in-aid-of-execution, the following admissions were made by Davis beginning at page 159:

20 | *Q.   And the invasive [procedures] are being done*

21 | *at the Cosmetic --*

22 | *A.   Right.*

23 | *Q.   But it's all at the same facility?*

24 | *A.   The cosmetic surgery facility is at a*

25 | *different address.*

1 | *Q.   Same complex?*

2 | *A.   Complex, correct.*

3 | *Q.   The equipment to do the surgery, the*

4 | *invasive procedures, has that always been*

5 | *located near --*

6 | *A.   It's never been moved.*

7 | *Q.   Never been moved?  Always in the same*

4

8   place?

9      A.   Always in the same place.  Never been

10  moved.

11     Q.   And again, forgive me if these are

12  silly questions, but it seems like you used to

13  do the invasive surgeries at Strax

14  Rejuvenation; right?

15     A.   Uh-huh.

16     Q.   In the bookkeeping, under the

17  accounting, that income would be in Strax

18  Rejuvenation?

19     A.   Right.

20     Q.   Now the invasive procedures are being

21  done at the Broward Surgery -- or is it

22  Cosmetic?

23     A.   Cosmetic Surgery Center.

24     Q.   Cosmetic Surgery Center.

25     A.   Broward Surgery Center and Jade.

1   They are broken up into different places.

2      Q.   Where the surgeries are done, it's

3   the same equipment, same location?

4      A.   Everything is the same.  The

5   equipment has never been moved.  All the

6   *equipment is still there.*

7     **Q. So it's the identical income that's**

8   **being received in a combination of Strax**

9   **Rejuvenation, Jade, Broward Surgery and**

10   **Cosmetic Surgery Associates, as was formally**

11   **received under the one heading of Strax**

12   **Rejuvenation?**

13     *A. That's correct.*

See Deposition of J. Davis at Pages 159-161, attached hereto as Exhibit "A."

22.     Mr. Davis continued later in the same deposition:

12     **Q. So at the same facility, the complex,**

13   **the same type of work, the same type of**

14   **surgery is still being performed, but the**

15   **income from it is going to other entities?**

16     *A. It's being directed to other*

17   *entities, which are separate entities that*

18   *didn't exist before too.*

See Deposition of J. Davis at Page 172, attached hereto as Exhibit "A."

23.     In other words, Davis admits that the Debtor's operations are now conducted by Jade at the same locations with the same equipment, and the revenue originally collected by the Debtor, is now collected by Jade.

24.     Similar testimony was offered at the Section 341 Meeting of Creditors where Davis testified that Jade was given the right to use the Debtor's name "Strax," but never paid for it.  See Section 341 Testimony of J. Davis at Pages 16-17, attached as Exhibit "B."

25.     Davis went on testify that Jade was originally created to provide management services for the Debtor.  However, that changed in the fourth quarter of 2012, when there was significant bad press negatively impacting the Debtor's business, which then led the Debtor to transfer its assets and operations to Jade.  See Section 341 Testimony of J. Davis at Pages 19-23, attached as Exhibit "B."

26.     Davis testified as follows:

> A.     *So I had to change all of my advertising, so that 75% of my advertising no longer utilized Strax as the company that you were going to.*
>
> Q.     *What is the name you use now?*
>
> A.     *I now use Jade, I use Surgery Approval, I use New Look Boca.*
>
> Q.     *You use different names than Strax?*
>
> A.     *I keep the name Strax in about 20 to 25 of my ads, o 75 to 80 percent, because Strax became like a poison.*
>
> Q.     *So the impetus for move -- and as I understand it, you shifted the business, you moved in the business that was Strax, our debtor, and moved it into Jade, is that right?*
>
> A.     *I moved the sales portion of it to Jade.  I advertised them in Jade, for people to come to Jade.  I took the name Strax off all the doors.*

Q.     *Okay.  So you -- effectively converted our debtor from what was an*

       *operating entity, right, doing surgeries, doing advertising, doing*

       *everything under the   Strax name, and make it a marketing company?*

A.     *That's correct.*

       *MR. BARMAT:  Object to the use of the word converted, but go ahead.*

       *Go ahead.*

BY MR. AMRON:

Q.     *Is that about right?*

A.     *Okay.*

Q.     *No, it's a yes or no?*

A.     *Yes.*

See Section 341 Testimony of J. Davis at Pages 23-24, attached as Exhibit "B."

27.     Again, Davis is admitting that Jade and other related entities are conducting the

Debtor's business and collecting the Debtor's revenue.

28.     This is further documented in the Debtor's statement of financial affairs in which

the Debtor states that two leases were transferred from the Debtor to Jade and Surgery Center of

Broward just weeks before the instant bankruptcy filing.  [ECF 1 at SOFA 10]

29.     What makes Davis' testimony so compelling is the later admission that the

transfer to Jade was done when lawsuits were pending against the Debtor:

Q.     *Okay.  At the time that this shift was done in the fourth quarter of 2012,*

       *were there lawsuits pending against this Debtor?*

A.     *Yes.*

Q.     *And, in fact, there was a judgment that had been entered at that time?*

8

A.    *Yes, sir.*

See Section 341 Testimony of J. Davis at Pages 252-26, attached as Exhibit "B."

30.    Based on the foregoing, Ms. Williams respectfully suggests that liability on the Jade Claims is a summary judgment issue.

*The Proposed Payment is Incongruous
with Funds Available for Settlement and Filed Claims*

31.    The Proposed Settlement is substantial at $750,000.00.

32.    However, settlements are not evaluated in a vacuum.

33.    Here, the Debtor (and subsequently Jade) generated significant revenue that does not justify a settlement in the range proposed by the Trustee, especially when that amount will provide very little to creditors the majority of whom were injured by the Debtor.

Revenue is Significant

34.    The revenue generated by the Debtor and later by Jade is significant.

35.    Before the Debtor fraudulently transferred its assets to Jade, it allegedly agreed to pay Jade a management fee equal to 5% of revenue.  See Deposition of J. Davis at Page 139, attached as Exhibit "A."

36.    By the end of 2012, that alleged fee totaled $3,272,559 in 2012.[3]  See Deposition of J. Davis at Pages 139-140 and 162, attached as Exhibit "A."

37.    Based on that figure, the Debtor generated at least $65,451,180 in revenue since 2005 when Jade was first formed.

---

[3] The alleged management fee arrangement was not in place when the Debtor first began operations in 2004. Jade was not even formed until 2005. As such, the fee may not be representative of all of the Debtor's revenue. See 341 Meeting Transcript at Page 18, attached as Exhibit "B" (Davis testifies that management agreement was not in place until 2005 or 2006).

38.     That means that the Debtor generated more than $9,000,000 in revenue each year on average.

39.     And more recently in 2011 and 2012, the Debtor generated $15,834,571 and $13,390,550, respectively.[4]  [ECF 1 at SOFA 1]

40.     The revenue in the preceding two years is believed to have been even higher,[5] which signals an ability to pay more than $750,000 over five years - a mere $150,000 per year.

41.     Ms. Williams requests an opportunity to conduct due diligence, review the materials produced to the Trustee, or at the very least speak with the Trustee and his professionals to better understand the financial condition of Davis and Jade before the Proposed Settlement is considered by this Court.

<u>Ms. Williams is One of Many Injured Former Patients</u>

42.     While Ms. Williams filed the instant objection on her own behalf, she notes that she is but one of many injured former patients who make up the largest share of the creditor body.

43.     A quick review of the claims register in this case reflects claims filed by several more former patients who have suffered significant injuries.

44.     The Debtor identifies 12 such patients in its statement of financial affairs.  [ECF 1 at SOFA 4]

45.     The value of these claims totals several million dollars.

---

[4] The Debtor indicated in its statement of financial affairs that it only generated $80,678.40 as of September 2013 [ECF 1 at SOFA 1], but that low figure is based on the transfer of the Debtor's operations to Jade.

[5] Ms. Williams focuses on revenue because the numbers are significant and because net income is skewed by what she believes are unreasonably high expenses including but not limited to large salaries paid to Davis and others.

46.    And again while the Proposed Settlement is not insignificant at $750,000, at the end of the day, it will provide little in terms of compensation to Ms. Williams and the other injured parties.

47.    In rough numbers the Proposed Settlement will provide $62,500 to each injured party over five years, not accounting for the costs of administration of the estate and the claims of other creditors, which will certainly reduce any distribution.

48.    And to add insult to the injuries suffered by the Debtor's former patients, the Debtor (through Jade) and Davis will continue to do business into the future.

49.    Given the spirit of 11 U.S.C. § 550, this is particularly frustrating.

50.    Section 550 of the U.S. Bankruptcy Code provides the mechanism by which a trustee may recover a fraudulent transfer.

51.    And that section is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred. *Morris v. Kansas Drywall Supply Company, Inc. (In re Classic Drywall, Inc.)*, 127 B.R. 874, 876 (D. Kan.1991); *Pritchard v. Brown (In re Brown)*, 118 B.R. 57, 60 (Bankr. N.D. Tex.1990); *Tidwell v. Chrysler Credit Corp. (Matter of Blackburn)*, 90 B.R. 569, 573 (Bankr. M.D. Ga.1987).

52.    Put another way, the estate is entitled to the best possible recovery. That is why it is within the court's discretion whether the transferred asset or its value should be returned to the estate. *In re Classic Drywall, Inc.*, 127 B.R. at 877; *First Software Corp. v. Computer Associates Int'l, Inc. (In re First Software Corp.)*, 107 B.R. 417, 423 (D. Mass.1989); *Gennrich v. Montana Sport U.S.A., Ltd. (In re International Ski Service, Inc.)*, 119 B.R. 654, 656 (Bankr. W.D. Wisc. 1990); *Burtrum v. Laughlin (In re Laughlin)*, 18 B.R. 778, 781 (Bankr. W.D. Mo.1982).

11

53.     At least one court has suggested that the estate is entitled to a return of the transferred asset and a money judgment equal to the value of the transferred asset, so long as the estate is limited to one satisfaction. *In re American Way Service Corp.*, 229 B.R. 496 (Bankr. S.D. Fla. 1999). *See* 11 U.S.C. § 550(d). By awarding the Trustee a money judgment *and* the property in kind, a court expedites the ultimate satisfaction of the money judgment, a result that is entirely consistent with the Code because it minimizes collection costs and reduces the possibility of any further fraudulent conveyances. *American Way*, 229 B.R. 496. *See Classic Drywall*, 127 B.R. at 877 (the recovery to an estate can be enlarged by eliminating both the expense of administering a sale and the risk of obtaining a lower price at a sale).

54.     All of this is meant to suggest that any settlement with Jade and Davis that does not contemplate future revenue, because that is the true value of the Debtor's assets, is insufficient as far as Ms. Williams is concerned.

### The Standard for Approval has Not been Established

55.     Generally, a compromise and settlement proposed under Rule 9019, Fed. R. Bank. P., can be approved if it exceeds the lowest point in the range of reasonableness. *In re Arrow Air, Inc.*, 85 B.R. 886, 891 (Bankr. S.D. Fla. 1988).

56.     That is not the only consideration.

57.     Probability of success, difficulties of collection, and complexity of litigation are considered. But "emphasis is placed upon…the paramount interest of the creditors and proper deference to their reasonable view in the premises." *In re Lloyd, Carr and Company*, 617 F.2d 882, 891 (1st Cir. 1980) (internal quotations omitted).

58.     The 11th Circuit echoes the relevance of creditor support and includes it as one of the factors weighed when considering whether to approve (or not to approve) a proposed

settlement. *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544 (11th Cir. 1990).

59.    Here, Ms. Williams does not believe that approval of the Proposed Settlement is appropriate at this time.  Ms. Williams believes that many of the other injured former patients feel the same way.

60.    Again, this is not to criticize the Trustee or his professionals.

61.    Instead, it is a call for further investigation into the finances of the Debtor, Jade, and Davis, in cooperation with the creditors who may be in position to assist the Trustee in this process.

62.    Until this can be accomplished, Ms. Williams asserts that approval of the Proposed Settlement is premature. *See In re Lloyd, Carra and Company*, 617 F.2d at 891 ("No case has come to our attention, however, where a compromise has been imposed without the support of a single creditor and over the active opposition of the major creditors.").

### Conclusion

WHEREFORE, Ms. Williams respectfully requests entry of an order (a) sustaining the Objection and denying the Motion; (b) alternatively, continuing the hearing such that the creditors can work cooperatively with the Trustee and his professionals to better understand the finances of the Debtor, Jade, and Davis in order to evaluate the reasonableness of the Proposed Settlement, (c) alternatively, establishing a briefing and/or discovery schedule and scheduling an evidentiary hearing where legal argument and factual testimony can be provided with respect to

[THIS SPACE INTENTIONALLY LEFT BLANK]

the relief requested in the Motion, or (d) granting such other and further relief as this Court deems appropriate under the circumstances.

Dated: November 25, 2014

**MARKOWITZ, RINGEL, TRUSTY &HARTOG, P.A.**
*Attorneys for Christine Williams*
9130 South Dadeland Boulevard
Two Datran Center, Suite 1800
Miami, Florida 33156-7849
Telephone: (305) 670-5000
Facsimile:  (305) 670-5001

By: ____/s/ Ross R. Hartog_____
          ROSS R. HARTOG
          Florida Bar No. 272360
          E-mail: rhartog@mrthlaw.com

and

**FREIDIN DOBRINSKY BROWN & ROSENBLUM, P.A.**
*Attorneys for Christine Williams*
One Biscayne Tower, Suite 3100
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 371-3666
Facsimile: (305) 371-6725

By: ____/s/ Joel H. Brown_____
          Joel H. Brown
          Florida Bar No. 131231

524612

14

# EXHIBIT A

Page 1

IN THE CIRCUIT COURT OF THE
17th JUDICIAL CIRCUIT, IN
AND FOR BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:  12-30932-18

CHRISTINE WILLIAMS,

    Plaintiff,

vs.

STRAX REJUVENATION AND
AESTHETIC INSTITUTE, INC.,
f/k/a, and Successor to,
STRAX REJUVENATION AESTHETIC
INSTITUTE, LLC, a Florida
corporation

    Defendant.

_____/


Monday, July 1, 2013
12:59 p.m. - 4:47 p.m.
950 South Pine Island Road, Suite A-150
Planation, Florida 33324


DEPOSITION OF JEFFREY DAVIS


    Taken before Rinele Abramson, Notary

Public in and for the State of Florida at

Large, pursuant to Notice of Taking

Deposition filed in the above cause.

- - - - - - -

1    on your balance sheet?

2        A.    Correct.

3        Q.    If ultimately, they do pick the date,

4    it comes off of here?

5        A.    Perfect.

6              And you said you didn't know

7    accounting.

8        Q.    I'm making it up as I go along.

9              The P&L statement January 1st through

10   June 10th of 2013 for Strax Rejuvenation,

11   there is a total income for the first five

12   months of what looks like a net of 80,000

13   minus the patient refunds we've talked about;

14   is that correct?

15       A.    Yeah.

16       Q.    Why is it so low for these first six

17   months compared to the six months --

18       A.    Like I said, because we stopped doing

19   anything but minimally invasive procedures.

20       Q.    And the invasive ones are being done

21   at the Cosmetic --

22       A.    Right.

23       Q.    But it's all at the same facility?

24       A.    The cosmetic surgery facility is at a

25   different address.

Page 160

1    Q.    Same complex?

2    A.    Complex, correct.

3    Q.    The equipment to do the surgery, the

4    invasive procedures, has that always been

5    located near --

6    A.    It's never been moved.

7    Q.    Never been moved?  Always in the same

8    place?

9    A.    Always in the same place.  Never been

10   moved.

11   Q.    And again, forgive me if these are

12   silly questions, but it seems like you used to

13   do the invasive surgeries at Strax

14   Rejuvenation; right?

15   A.    Uh-huh.

16   Q.    In the bookkeeping, under the

17   accounting, that income would be in Strax

18   Rejuvenation?

19   A.    Right.

20   Q.    Now the invasive procedures are being

21   done at the Broward Surgery -- or is it

22   Cosmetic?

23   A.    Cosmetic Surgery Center.

24   Q.    Cosmetic Surgery Center.

25   A.    Broward Surgery Center and Jade.

Page 161

1    They are broken up into different places.

2        Q.    Where the surgeries are done, it's

3    the same equipment, same location?

4        A.    Everything is the same.  The

5    equipment has never been moved.  All the

6    equipment is still there.

7        Q.    So it's the identical income that's

8    being received in a combination of Strax

9    Rejuvenation, Jade, Broward Surgery and

10   Cosmetic Surgery Associates, as was formally

11   received under the one heading of Strax

12   Rejuvenation?

13       A.    That's correct.

14       Q.    Okay.

15             What are the sales running now a

16   month at Broward Surgery Center?  Can you

17   estimate?

18       A.    Well, way off, maybe a couple --

19   maybe combined with all the companies, maybe

20   600,000 a month.  Maybe.

21       Q.    All the companies, meaning Broward

22   Surgery, Cosmetic Surgery Associates and Boca

23   Surgery Center?

24       A.    And Jade.

25       Q.    And Jade.  You are doing about

Page 172

1    Ditech.

2        Q.    Do you have interest in any of those

3    other companies --

4        A.    No.

5        Q.    -- you just named?

6        A.    Well, Cosmetic Surgery of Boca.

7        Q.    Right.

8        A.    But we are also doing -- going out

9    and reaching out to get other companies under

10   the umbrella and become like a Ditech and be a

11   marketing company.

12       Q.    So at the same facility, the complex,

13   the same type of work, the same type of

14   surgery is still being performed, but the

15   income from it is going to other entities?

16       A.    It's being directed to other

17   entities, which are separate entities that

18   didn't exist before too.

19              MR. BROWN:  Do you want to ask

20       anything?

21              MR. COHEN:  No, and we won't waive.

22              (Thereupon, the deposition was

23       concluded at 4:42 p.m.)

24

25

1          Where else was money borrowed from
2   that would add up to 11 million in loans?
3          A.   Some of it was not money that was
4   borrowed.  They had an agreement to pay a
5   percentage management fee to Jade, which they
6   never paid.
7          Q.   Who is the "they"?
8          A.   Strax Rejuvenation had a management
9   fee that they were supposed to pay, either 5
10  or 10 percent.  So it got on the books each
11  month as being owed.  There was no cash
12  transaction, but you will see on the P&L,
13  management fees.
14          So on the P&L, they took the expense
15  from management fees, the Subchapter S, but
16  they didn't really have the cash to pay it, so
17  it shows as a payable.
18          Q.   So the deal was 5 percent of what,
19  gross revenue?
20          A.   Gross sales.
21          Q.   Gross sales?
22          A.   Right.
23          Q.   So 5 percent of gross sales is what
24  is part of this intercompany loan figure --
25          A.   Right.

Page 140

1    Q.    -- because it was never paid?

2    A.    Correct.  Never paid.

3    Q.    So it would be incurred --

4    A.    Accrued.

5    Q.    It would be accrued so you would

6    carry it as a loan.

7          Then your books are on an accrual

8    basis, not cash basis?

9    A.    That is correct.  Absolutely.

10   Q.    Is that throughout all of your

11   accounts on the general ledger?  They are all

12   accrual?

13   A.    Yes.  You can switch it by pushing a

14   button.

15   Q.    Switch them to --

16   A.    A cash basis by pushing a button.

17   Q.    You can go back and forth to see what

18   your real cash flow or so forth is?

19   A.    Yeah.

20   Q.    You've already told me who Osak

21   Omulepu is.

22         Who is Dr. Okpaku, O-K-P-A-K-U?

23   A.    Again that was money that I lent

24   Dr. Okpaku.  It was the same as the Ortega

25   scenario.  It was money that was lent.  He

Page 162

1    $600,000 a month?

2        A.    Total.

3        Q.    And you are doing about -- if you

4    have only done 80,000 in six months, so you

5    are doing about 12,000 or 15,000 a month --

6        A.    At Strax.

7        Q.    -- at Strax; is that correct?

8        A.    Uh-huh.

9        Q.    I'm showing the federal tax return

10   from -- it's dated 2/5/2013.  It shows your

11   2012 filing, you have management fees of

12   3,272,559 were collected.

13           Can you tell me from who these

14   management fees were collected?

15       A.    We've already covered that.

16   Remember, I told you -- you asked me about the

17   liability.  They were never collected.  They

18   were accrued, shown as a liability here, shown

19   as a liability on Strax's book.  But they were

20   never paid.  It's just an accrual entry.  We

21   covered that.

22       Q.    So on the federal income tax return,

23   that entry is an accrual funds you told me

24   about, part of the 11 million previously --

25       A.    That's absolutely correct.

# EXHIBIT B

Page 1

1           UNITED STATES BANKRUPTCY COURT
2            SOUTHERN DISTRICT OF FLORIDA
3

4

IN RE:                    CASE NO. 13-31119-JKO
5

 SRAI, INC.,
6

            Debtor.
7  _____/

8

9            341 MEETING OF CREDITORS

10              October 10, 2013

11

12       The above-entitled cause came on for a Section

13  341 Meeting of Creditors before SCOTT BROWN, one of the

14  trustees in the UNITED STATES BANKRUPTCY COURT, in and for

15  the SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

16  Fort Lauderdale, Broward County, Florida on October 10,

17  2013, commencing at or about 12:30 p.m., and the following

18  proceedings were had.

19

20

21

22

23            Transcribed from a CD by:
              Cheryl L. Jenkins, RPR, RMR
24

25

Page 16

1  used the name.  So Jade Holdings actually had the original

2  right to use the name.

3          Q.    Okay.  Did our debtor pay Jade Holdings for

4  the right to use that name?

5          A.    There is an agreement where the debtor would

6  pay for that right.

7          Q.    Where is that agreement?

8          A.    It's supplied as part of the schedules as a

9  trademark, as part of the schedules we supplied that

10  document.

11          Q.    Okay.  We'll take a look.  If we don't have

12  it, we'll follow up with you --

13          A.    Okay.

14          Q.    -- okay?

15                So you were saying, was there any money that

16  exchanged hands for the right to use that name?

17          A.    There was not money that exchanged hands,

18  there was journal entries, but not physical cash that

19  exchanged hands.

20          Q.    So the debtor currently today has --

21  maintains that right to use the name Strax, is that right?

22          A.    The debtor today?

23          Q.    Yes.

24          A.    Well, they're delinquent on the payments,

25  but it has never been enforced, the debtor never enforced,

Page 17

1    or the debtor was never ---

2             Q.    You mean Jade never enforced the payment

3    obligations of the debtor?

4             A.    Yes.

5             Q.    Did -- and how much was the payments, what

6    were the payment obligations?

7             A.    I'm not sure of the amount.

8             Q.    Who would know that?

9             A.    It's in the document.

10            Q.    In the, you mean in the agreement itself?

11            A.    Right.

12            Q.    Okay.  Is there -- should we see on the

13   books and records of the debtor and Jade journal entries

14   reflecting this obligation?

15            A.    At year end there were journal entries that

16   would be reflect that obligation.

17            Q.    Did Jade -- I know Jade had in-house

18   counsel, but let me go back for a second before I ask you

19   that.  Who did in-house counsel work for?

20            A.    Both Jade and Strax Rejuvenation

21   (inaudible) ---

22            Q.    Who paid him?

23            A.    Actually he got paid out of both in the

24   beginning, and then out of Strax in the last couple of

25   years, but in the beginning he got paid out of both

Page 19

1   entities?

2           A.      No.

3           Q.      Okay.  What was Jade's, or what is Jade's

4   business?

5           A.      Currently?

6           Q.      Back, prior to the bankruptcy petition, and

7   if it's changed --

8           A.      It's changed.

9           Q.      -- tell me.

10              Well, what was it, and tell me what it is

11  now, and when it changed.

12          A.      Up until the fourth quarter of 2012, Jade,

13  the LLC, was a holding company for Strax of Boca, Strax of

14  Miami, and they provided management services, accountant,

15  legal, my service, Mr. Maling services as CFO, and paid a

16  management fee for the services that were provided then,

17  for basically managing them while these people were

18  getting paid, like, myself and Mr. Maling, and Mr. Feanny

19  were getting a paycheck from Strax Rejuvenation.  They

20  would perform services for Jade Holdings, and then there

21  was a management fee that was supposed to be paid back to

22  Jade, back to Strax, the debtor, for those services.

23              (Thereupon, there were loud sirens in the

24  background.)

25          Q.      Let me see, and I'm not sure I follow, but

1  Jade was the manager.  There were two Strax entities

2  underneath Jade, is that right?  Excuse me, Jade was a

3  holding company?

4         A.    (Inaudible.)

5         Q.    And there were two Strax entities underneath

6  that?

7         A.    Correct.

8         Q.    Strax Miami and Strax Boca?

9         A.    Right.

10        Q.    Strax Miami is our debtor, is that right?

11        A.    No.

12        Q.    No?

13        A.    Strax Miami (inaudible) ---

14        Q.    Okay.  So what's the relationship of our

15  debtor to Jade Holdings?  (Inaudible.)

16              THE WITNESS:  Jade Holdings performed

17  management services for the debtor, that provided

18  management services for the debtor, accounting, legal,

19  marketing.

20              (Thereupon, the sirens stopped.)

21  BY MR. AMRON:

22        Q.    Okay.  So it wasn't a holding company for

23  the debtor, but it was a management company for the

24  debtor?

25        A.    That's correct.

1       Q.    Okay.

2       A.    And a holding company for the other two

3    entities.

4       Q.    Okay.  In terms of order of chronology, our

5    debtor versus the other two Strax entities, which came --

6    how were they formed, in terms of chronological order?

7       A.    Our debtor was formed first.

8       Q.    In what year?

9       A.    Well ---

10      Q.    It doesn't matter, keep going.

11      A.    Strax of Boca was formed second, and Strax

12   of Miami was formed third.  There was also Boca Raton

13   Surgery Center that was formed somewhere in between Strax

14   of Boca and Strax of Miami.

15      Q.    Strax of Boca, when was that formed?

16      A.    I'm going to say that was formed in 2009.

17      Q.    Strax of Miami, when was that formed?

18      A.    2010.

19      Q.    And then this Boca entity you said was

20   somewhere in between?

21      A.    Surgery Center.

22      Q.    Okay.  Did you, or did -- was it common to

23   refer to all of these entities as Strax Rejuvenation

24   Companies?

25      A.    It was common up until the fourth quarter to

Page 22

1    refer to them as one company, Strax.

2            Q.     Including our debtor?

3            A.     Including our debtor, correct.

4            Q.     And then there was this shift in the fourth

5    quarter?

6            A.     That is correct.

7            Q.     What was the impetuous for this shift?

8    In other words, obviously there was something that

9    triggered you --

10           A.     Yes.

11           Q.     -- or other people within your corporate

12   structure to go to these lawyers, and what was it?

13           A.     There was a tremendous amount of bad

14   publicity that hurt the business tremendously.  So it

15   became apparent, the brand name Strax was no longer

16   goodwill, but was the diametric opposite, it became bad

17   will, people stopped going there because they were Strax.

18   There was a death where an attorney had a major press

19   conference, it was a fat transfer, whether it's here or

20   there, the doctor was later exonerated, but they made a

21   big deal out of it, it was on all the t.v. stations, and

22   it was then picked up by the Sun Sentinel, (inaudible) it

23   was picked up in the New York Times.  It did a tremendous

24   amount of harm to the business.

25                  People were cancelling their surgeries.  The

Page 23

1    amount of people that were booking new (inaudible) from

2    the advertising was cut by 50 percent or more.  Some of

3    the companies that provided us with third party financing

4    got scared and pulled the third party financing, or made

5    us put up performance bonds in order to keep it.  It

6    became extraordinarily apparent to me that was there no

7    way to survive utilizing just the Strax name, because

8    there was a tremendous amount of ill-will in the

9    community.  If you Googled Strax, the first thing that

10    came up was the Sun Sentinel article that said (inaudible)

11    deaths at Strax.  So I had to change all of my

12    advertising, so that 75 percent of my advertising no

13    longer utilized Strax as the company that you were going

14    to.

15            Q.    What is the name you use now?

16            A.    I now use Jade, I use Surgery Approval, I

17    use New Look Boca.

18            Q.    You use different names than Strax?

19            A.    I keep the name Strax in about 20 to

20    25 percent of my ads, to 75 to 80 percent, because Strax

21    became like a poison.

22            Q.    So the impetus for move -- and as I

23    understand it, you shifted the business, you moved in the

24    business that was Strax, our debtor, and moved it into

25    Jade, is that right?

Page 24

1          A.      I moved the sales portion of it to Jade.   I

2     advertised them in Jade, for people to come to Jade.   I

3     took the name Strax off of all the doors.

4          Q.      Okay.  So you -- effectively you converted

5     our debtor from what was an operating entity, right, doing

6     surgeries, doing advertising, doing everything under the

7     Strax name, and made it a marketing company?

8          A.      That's correct.

9               MR. BARMAT:   Object to the use of the word

10    converted, but go ahead.   Go ahead.

11    BY MR. AMRON:

12         Q.      Is that about right?

13         A.      Okay.

14         Q.      No, it's a yes or no?

15         A.      Yes.

16         Q.      Yes, okay.  So, but why would you need to do

17    that if all it was was changing the name and going out and

18    just marketing yourself under a different name, why would

19    you need to move the business to a different entity?

20         A.      Because I needed to also simultaneously,

21    which was under legal advice, separate the liability so

22    that if you were the Surgery Center, and unfortunately

23    that happened at the Surgery Center, it wouldn't

24    necessarily take down the entire company going back to one

25    company being the old debtor, so that each company now was